Page number 23-74, NextEra Energy Resources, LLC and NextEra Energy Resources, LLC petitioners versus Federal Energy Regulatory Commission. Mr. Estes for the petitioners, Mr. Kennedy for the respondents, Mr. Konopka for the interveners. May it please the Court, I'd like to reserve three minutes for rebuttal. FERC claims that the text of the LGIA in this case, mainly section 5.7.5, creates ongoing obligation for Seabrook to upgrade the breaker at significant uncompensated cost for the benefit of future competitors. Avangrid never mentioned 9.7.5 below and FERC never mentioned it until the rehearing order. The only mention comes from ISO New England, a party, who says it didn't apply, that it did not create any obligation on Seabrook to upgrade the breaker for future competitors. When we look at the text of the document, I assume it was correct. You can find it at J325, 326, and the whole case turns on it. The first thing we see when we look at the text is we're given a couple of interpretive aims. The parties intended us to read the text in accordance with the ISO New England operating documents. FERC tells us in footnote one of its brief that the tariff is one of those documents, and that figures in when we look at the specific obligations that the agreement creates. I do want to hear what you have to say, but I just need some table setting here. I just want to make sure I understand what's in dispute in this case, because I thought I saw in your brief that you don't have any problem. You don't oppose. You don't deny the ability of, if I'm saying it right, Avangard to, or Avangard, I guess, to connect. This is all really a dispute about, and you'll get your construction cost, it's all really a dispute about whether you will get some of the other costs that you have referenced in your brief, the opportunity costs and things like that. Am I right that that's really what's at issue here? Because it sounds like you're about to get into things about the authority to have the connection, but it sounded to me from your brief that you're not vetoing, you're not saying they can't connect. It's just that you don't feel like FERC's decision about the type of compensation you get is sufficient. Am I right, or am I misunderstanding? You're exactly right, Judge Millett. If FERC had said, you have to do this, and we're going to make you completely whole, we wouldn't be here. We would be concerned about the policy implications of that ruling because this agreement is all over the country. There are many, many, many situations where it exists, but we wouldn't exist if we've agreed to make the upgrade. But FERC leverages a misreading of the contract into claiming it can force us to make the So we need to take this bit by bit because they claim the parties agreed in the LGIA, despite the no third party beneficiary language, that Seabrook has some open-ended obligation. We need to cut that off and then get it. I understood your argument to be the opposite, which was you were arguing that you did have a right to veto the connection by Avangrid. And then, in the alternative, and only as a fallback, that if you were wrong about that point, you were at least entitled to opportunity costs. Am I wrong about the first piece? We interpret the contract to not force us to upgrade the breaker. We agreed to upgrade the breaker, nonetheless, as a matter of commercial negotiation if we're made whole. But you're still challenging the first part of that. We are. That would be a very vague confession otherwise. Yes, no, we're challenging the first part. We're just saying that doesn't mean we're refusing to upgrade the breaker. We just want to be made whole when we do it. But your position is that you can refuse to allow Avangrid to connect, even if they compensate you for opportunity costs and lawyer costs, or not. If you want to give that up, that's great. That'll narrow the case. I thought you were pressing that point. Our position is that the LGIA does not obligate us to upgrade the breaker. Period. Period. We're not saying FERC doesn't have other tools in other contexts. If we imagine someone just saying, we're not doing it, we're never upgrading this breaker. Go pound sand. I just want to clarify, because it sounds like two very different answers. I thought your argument was that FERC doesn't have the authority to order the circuit breaker replacement without full, shall we, a compensation payment, I'm not sure, without full payment of lost costs. Our position is that the LGIA does not give FERC any basis for ordering CBOOK to upgrade the breaker. No matter what the cost. No matter what. FERC would have other tools in that situation it can employ, which I'll talk about. But the LGIA... It doesn't matter, because you said you're happy to replace the circuit breaker as long as you get full costs. Which means that if we just come down to the question of what costs you get or not, then we're fine, because you're happy to replace it. Our position is that the contract doesn't obligate us to replace the breaker. Commercial negotiations between the parties can yield terms under which we're made whole and we do so. And we've always agreed to go down that road. That's not what happened, because Avangrid complained that we were a transmission owner and we were blocking their entry. FERC ruled we were not a transmission owner, but nonetheless ordered us to upgrade the breaker and did not provide for full compensation. We fight the basis for the finding that we have to upgrade the breaker. We fight jurisdiction and we fight compensation. You don't have to reach the compensation issue if you rule for us on the first two issues, which brings us to the contract. Okay. So just... I'm sorry, Your Honor, if you're fighting... No, no. So you have no intention of replacing the circuit breaker with Avangrid paying construction costs. Did you say we have no intention? Right. You're not willing to replace the circuit breaker. If you went on the first ruling or even the second, if you went on the contract or FERC doesn't have power, that's it. You're not replacing the circuit breaker. That's not correct, Your Honor. We've said repeatedly that we are willing as a matter of just commercial negotiation to do this. We're not trying to block a competitor. We're not trying to create a catch-22. We just want to be made whole. And FERC's tool... What you just said was your third question is your first one. If you get the cost that you want, we don't have to fight about the contract names because you're willing to do it as long as you get full cost. We don't have to fight about FERC authority because you yourselves are willing to get it, do it, if you get full cost. Is that understanding correct? If we were made whole, we would replace the breaker, but that's not what the order said. On your own, without... Regardless of... Which is the way most of the power business does business, actually. Commercial negotiation between the parties without regulatory compulsion. So you... Okay. All right. I think I understand. I'm sorry if... Yes. Let me maybe switch gears a little bit. I'm wondering what remedial authority, in your view, did FERC exercise here? Because it doesn't suggest that it's operating under Section 206, right? Are they operating under Section 309, their general grant of remedial authority? Where does their remedial authority come from in this case? Well, they granted a complaint filed under 206, but they didn't really say, Your Honor, and we don't think they have a basis for authority. That's one of the problems here. They've interpreted a contract and inserted their own point of view about what the words should mean, though the words don't say that, and so they are claiming authority is given to them by the parties in the LGIA when the parties did not give them anything like that. To make a determination under 206, FERC has to first find that the existing rate or term is unjust or unreasonable. But did they make that finding here? I mean, if they had made that finding, then they could have amended the tariff. Do you think that would be within FERC's authority? Your Honor, I agree completely with that, and we said this on brief. The LGIA is a dog that doesn't hunt, but FERC has other tools. One of them was to create a 206 proceeding to examine whether the ISO tariff should be changed. They did that and abandoned it. They could have interpreted, they could have changed their whole fabric of interconnection facilities under 206. Where does Seabrook challenge this remedial authority? Do you raise this challenge that they didn't have remedial authority? I mean, you challenged their jurisdiction, but you challenged their remedial authority? We challenged their interpretation of the LGIA, which is where they claim the parties gave them authority. So, that's really what they're saying. You filed in the 206 proceeding as well. You asked them to say that the compensation you were getting was unreasonable. We filed for a declaratory order, and they ended up suspicion. Under 206? No, a different provision of the federal power of action, but they didn't go down. What did you file under? Your Honor, I can't tell you right now where in the power of action. I thought two parties came with a single dispute to FERC, because one complaint was under 206, and I had thought yours was in that same proceeding. It was. We filed first. We filed for a declaratory order. What did you file under? We filed for a declaratory order. The declaratory order is under a pursuant to FERC regulation that allows parties to seek declaratory orders. Are you asking me if there's a regulation? I mean, isn't there a regulation that allows parties to seek declaratory orders? There is. I see. And there's a part in the statute where this is envisioned, I do believe. Then Avangrid filed a week later a complaint. This was in 2020. FERC ended up granting the complaint in part, basing its decision solely on the LGIA. So they're claiming they can interpret a private contract and find the obligations they seek to impose on us from the text of that agreement. It's not in the words, however. That doesn't mean FERC didn't have other options. You're exactly right, Judge Rao. They could reopen the rules governing interconnection. They could change the way ISO2 England does things. They also, by the way, if you really want a rifle shot to deal with competitive blockades, somebody was saying in some other part of the country, you can't make me do this. It's 23 cents to fix it, but we want $23 million. FERC has a provision in its regs, because generators sell at market-based rates, that you have to tell them every few years, we're not erecting barriers to new entry. They never went down that road. That's not what we're doing. They looked to the contract, and when you look at the contract, it does not carry the way it's described. So FERC suggests that because Seabrook is required to follow good utility practices, that they are required to do this upgrade before Avangrid connects. And they, FERC repeatedly points to good utility practices as being found within the contract itself. And so I'm wondering what you think about that argument, right? So their argument seems to turn, their contractual argument places a lot of weight on this general term good utility practices. And then it says the contract is highly relevant, understanding what a good utility practice is. So why shouldn't we, you know, defer to FERC on its determination about what a good utility practice is? Well, if you look at the text of the contract, you find it doesn't support FERC's reading. Because 975 does incorporate good utility practice. If you turn to the text, you find the answers to a lot of what we're discussing. We're told at the very beginning of this provision, we're supposed to look, the parties wanted us to look in two places for just general guidance, in accordance with the ISO New England operating documents. The tariff is one of those, FERC passes input note one, okay, we'll need that in a moment. And in compliance with good utility practice. You look at J283, that is defined. But it sets out means to an end, it doesn't set out the end. It says you have a desired result, you're supposed to take one of maybe several different measures, doesn't have to be the optimum one, but things utilities generally do to accomplish that result. And you're supposed to do so at reasonable cost, consistent with, among other things, reliability and safety. Isn't a utility practice, though, I mean, the way that it's defined, suggests to me at least some type of industry standards. Yes. Right. That's right. And so FERC is saying an industry standard here is requiring Seabrook to do the upgrade. So why is that? I mean, I assume you think that's wrong. Why do you think that's wrong? There are several reasons it's wrong. One is they've never done anything like this before, so no one's ever been in this posture. But if you look at the language, good utility practice is an interpretive aid. We have duties under the provision that FERC cites. We are supposed to accomplish those duties using means consistent with good utility practice. But it doesn't tell us what the duties are. So we still have to look at the language, as FERC does, but not very fairly to the words, to see what we're supposed to do. Whatever it is we're supposed to do, we have to do in accordance with good utility practice. And we wholeheartedly agree. We need to watch out for reliability and safety. Absolutely. But that does not mean the words say what FERC... We have a contractual obligation. We have a contractual obligation, but Your Honor, we're also NRC licensees, and we're talking about working side of things with our plan. I'm talking about you have a contractual obligation, even as to the, because the ISO is a party to the good utility practice clause. Yes. It obligates us. To maintain safety and reliability of the grid. Well, you have to... For operations as they connect to and affect the grid. It doesn't give us a freestanding obligation to do things. It tells us when you're... I think, if I were to address questions, that part of good utility practice is to operate consistent with industry standards. And I didn't think you disputed that. We are doing that right now. Well, but if industry standards are that circuit breakers are supposed to have a 4% to 5% margin of error, and you have a 0.4% margin of error, how is that when your circuit breaker is hanging by a thread? Your Honor, I just... There's nothing... I don't think there's anything that can connect to the entire grid there that won't require replacement of your circuit breaker. Is that right? We don't know about anything. I haven't... Grid can't connect. But the circuit breaker... You're at... You're at... There's not enough energy on the circuit breaker. Is that correct? I'm... There is... There is... There is enough room for the circuit breaker to operate reliably without an additional interconnection, which is key. No, no. Stop. According to... Time out. Time out. Okay. Can any other entity come on the grid, any other source of energy, come on with anyone, a reliability repair, any increase in generation occur without you replacing your circuit breaker? The record... That it's right at the customer? Almost certainly so, but the record doesn't really tell us. No, but... Really? Your Honor, I... Four... You're at 0.4%. So, the way this tolerance works, so we put in expert evidence, Avon Grid has its experts. We put in ours to say, this percentage is not a problem. There's headroom... You said, this is not a problem on the grid now. That's right. And my question is, because you joined an ISO, and ISOs have all kinds of rules about allowing new energy in, new producers in, I'm gonna spend a lot of time coming up with non-discriminatory rules for that, so you're on a grid, you're not a solo operation here. And did your expert witness say that anyone, Kirk mentions all these other people in line to connect, can any single one of them connect without you changing the circuit breaker? Your Honor, let me go back to what actually happened and... No, no, no. You can do that after you answer my question. Okay. Can any other generation at all, or even an increase by someone already on the system, occur without the circuit breaker being replaced? Your Honor, I don't know the answer to that question on the record. Okay, so your expert didn't say, in response to Kirk saying, all these other folks wanna join. They can all join, it's just something about Avangrid. No, it's a question of ISO and WING doing really complicated engineering studies about power flows. Avangrid's line hooks up 100 miles from Seabrook, which sounds like a long way away, but there's a B-line of a transmission line that goes straight to the substation outside of Seabrook Station. So Avangrid, Avangrid's also 1,200 megawatts. That's a lot. That's a huge change to power flows in the system. If you had other people doing other things in a less electrically proximate place on the grid, probably it would be fine, but I don't know the answer to that, and ISO and WING have never... The standard is 4% to 5% margin of error, and you're at 0.4. We disagree with that standard, Your Honor, and your... What evidence do you have that there's a very different industry practice or industry standard of error? We put on an expert who explained that Avangrid's math is wrong. The NRC said... That's not telling me what the industry standard is. Below 100%. You're fine. The industry standard is... So if you were at 99.9, that would be hunky-dory with the industry, that would be consistent with safety and reliability. Yes, Your Honor. And your expert... Well, I mean, we would have to ask the experts potentially, but yes, the headroom issue is a false issue. No, no, no. I'm just asking about these questions. So you have expert testimony in this record that says it's industry standard to have a circuit breaker, perfectly fine, even at 99.9%. It doesn't say that, Your Honor. It says that the... You just said that. The percentage... You said under 100. I think that... Well, I don't think the expert affidavit says that. It says we're fine where we are. It explains... If no more power comes out of the grid. Other interconnections can change that. We don't know which ones. The reason why there's a bit of a lacuna here, Your Honor, if I may explain, is that a big project was in the queue, 1,200 megawatts. It was a straw that broke the camel's back. So Chancellor of England told America, you have to fix this, go figure it out. Every subsequent interconnection was modeled with the assumption that the breaker would be replaced for Avangrid. So we do not know the answer as to what else would happen. It is true that if Avangrid pulled the plug on his project, there probably is some other project that would then have to... That would then trigger this need. That is true. But the electrical sequence of studies, the sequence of electrical studies, doesn't work the way that... To allow me to answer the question. I'm sorry, Your Honor. We don't have that information. We do know Avangrid's project creates a problem. We know that our breaker is fully reliable now. The NRC said so, and FERC doesn't disagree. Can I just get back to the tariff? I'm sorry, the interconnection agreement. There is a specific duty with respect to circuit breakers. It references, it incorporates good utility practice, but it says that customers like circuit breakers, floral, and all other devices necessary to remove any fault contribution of that facility to any short circuit. Doesn't that seem to contemplate not just a duty at the moment of Seabrook's entry on the grid to have an adequate circuit breaker, but an ongoing duty to upgrade it as necessary for the grid? No, Your Honor. Let's take the words. The first part of what you read says that Seabrook's supposed to provide, install, and own and maintain a circuit breaker. The first three, it's already done. It maintains the circuit breaker right now every 18 months. The record says that at JA-491. The circuit breaker is supposed to be necessary to remove any fault contribution to any short circuit occurring. It's not otherwise isolated by basically New Hampshire transmissions equipment. That happens right now, too. The circuit breaker is fine for existing conditions. The question is, for sure, what about the future? And when you read this language in light of good utility practice, it does not create a contractual duty, and it's implausible to imagine that the parties intended to create For us to upgrade the breaker now, when it's reliable for the benefit of a third party, there's a clause against third-party beneficiaries. And it will be inadequate if some other generators, including Havoc Grid, are allowed onto the grid. Well, remember the first phrases when I said an incorporation barrier? So it seems to me like this provision cinches up Burke's case, unless you can point to something else which prevents other generators from seeking access to the grid. And I can. And I'll let you, but just for framing purposes, I'll just tell you that seems pretty unlikely in a system, a regulatory system, whose whole point was to encourage independent generators to be able to have access to transmission facilities. But go ahead. Well, I'll start with the words, and then I'll get to the policy. They're both really important. The first phrase of this provision says we're supposed to read it in accord with the tariff. And as we said in our brief, the tariff makes it legally impossible for Seabrook to interconnect without the breaker being upgraded. So the idea that there's a... Based on what provision? A JA724I.3.10 puts the onus on Avangrid... If they impose a significant adverse effect on transmission facilities and other market participants. Right. So our position is, Your Honor, that the... Okay. There are a couple of problems with that. One is if we're really fussy about reading the words, literally, this provision only applies to transmission facilities, and FERC has said this is a generator facility. It seems a little artificial to me, but even if I give you transmission equals generator for purposes of this clause, it just says unless Avangrid takes action or constructs at its expense facilities necessary to mitigate the problem, and that sounds more like they have to pay for the upgrade than they have to pay for lost profits and attorney's fees. Your Honor, the tariff says that if there's an adverse effect determined by the ISO on the system of one or more market participants, Seabrook is a market participant. It goes on to say the market participant or transmission owner is impacted. And it says that the new interconnectee must take such action at its expense. So it's not just building, it's fixing it. This is the... Judge Katsas, of the way interconnections work, the last 20-something years, you have a decision up front. Sorry, I'm just trying to... Sorry, bear with me. I'm just trying to find it. Where are we? Well, we're at JA-724. 724, right. I got it. In the middle of the phrase, it says adverse effect on a transmission owner or the system of one or more market participants. So Seabrook qualifies. There was a big fight about that, Your Honor, and this is part of... ...shall not proceed to implement unless the new party imposing the cost, which is Avangrid, takes such action or constructs at its expense facilities necessary to avoid the adverse effect. Sure. That, to me, to my ear, that could reasonably be read to say they have to pay the cost of upgrading the circuit breaker. That's their obligation, constructing such facilities to avoid the adverse effect. The way it's been read since the words existed is that the interconnecting company has to work things out with the system it's affecting. And that's a question of commercial negotiation. There's no regulatory oversight to check and see what the payment stream should be. They just have to go work it out. But if you go look back at the language and see what the obligation actually is, you see that this is not a situation where existing resources on the grid have an ongoing duty to pay tens of millions of dollars, perhaps, to upgrade their facilities for the benefit of a new entrant. That is... Is it your contention that that is the good utility practice, that good utility practice ordinarily involves this being through a commercial negotiation? I mean, do you have evidence of that as being the industry standard or the industry practice? That's what ISO New England said below. People work these things out. And most of the utility business is worked out, particularly under good utility practice, through coordination and negotiation. That's the way almost everything is done. It rarely is the case, this regulatory compulsion. But if you go back, you're not... The negotiation is going to be completely different if you start with a veto power. We don't think we have a veto power, Your Honor. We tell FERC every three years we're not going to erect barriers to new entry. We think we have the ability to be compensated reasonably and made whole. See, that's where we started this whole argument. I don't think you disagree with anything Judge Katz has read to you. It's just you have a dispute about what... You don't have any dispute that Avon Grid can come in as long as there's a veto power. Avon Grid pays construction costs and you have a different definition of construction costs. Isn't that what this is about? You said the cost of putting this circuit breaker in need to encompass all your costs, your money loss. Not just whatever it takes. I'm sure this is a big operation to get this big thing in there. But it's also opportunity costs. I don't know what else you're including in here. I don't know where the attorney's... If there's litigation, the attorney's fees. I just want to make sure... I keep coming back to thinking that that's what the fight is over is... You're not saying you can do a straight up veto. You're saying that what that contract means is they got to come in and pay the cost with this change. Your position is the way those costs should be figured out is not FERC's interpretation, but between contractual negotiation. Is that your position? We don't think the contract authorizes FERC to order us to upgrade the breaker. We're willing to do it if we're made whole. But FERC is refusing to make us whole based on the contract. So you disagree then with Judge Katz's at least proposing one reading of this language as you have an obligation to let Avangrid do it as long as they pay. You've signed up. You have your arguments. You've made your arguments about that. But one possible reading is you've signed up for this as long as they pay what's referred to as construction costs. I don't understand how you can say you don't have a veto and saying we can stand here with our arms crossed and say we are not doing it. FERC has no authority and you won't give us everything we want. We have a veto under the contract. Your answer to Judge Millett's question is you have a veto, but you have chosen not to exercise it. That's a much better way to put it, Judge Katz's. I do think the contract allows us to say no. That's true because it doesn't dictate that we do anything to hook up a new resource. There's a no third-party beneficiaries clause and it deals with a three-party contract. This is a group activity. This is the ISO. It's a group activity. You get the benefit of all different transmission lines and all their reliability. If one goes down from a storm, you've got others. The customers get the benefit of many, many different sources of generation if one goes down. For example, you're planning to go down for your own maintenance, whatever it is, in the fall. Customers will be okay because there's other generation on the lines, correct? That's how the system works. It benefits you. It benefits customers. You benefit others by being there, but it's a group activity. It's a tight power pool run by an RTO. It's a group activity. You're not the only generator and there's a lot of transmitters. If everybody else on the grid says, we need more electricity, electric cars are coming, all the fields are going down, the demand for electricity is expected to increase astronomically in the next 10 years. If they said that, then allowing someone to interconnect wouldn't be just a benefit for Avangrid. It would be a benefit for the system of which you are a part, correct? Under my hypothetical? I guess, Your Honor. If FERC says the way the country benefits, the way our electrical system benefits in this country is to have ISOs that allow new power in without discrimination, conditioned on them paying the cost of entry, and that's what's best for each grid individually, and so that's what's best for ISO New England here, and that's what's best for our electrical system and for keeping the lights on and for allowing America to function, then it's not a third-party beneficiary issue, right? It's the system that's been set up. The benefit is to the system of which you are a part, correct? There are many things about what you said that I disagree with, so I can't just say that's correct, but let me... The benefit is to, not just to Avangrid, but to the system. I think you already agreed with that. A benefit to Avangrid interconnecting is to the system as a whole? I don't know that I would stipulate to that, Your Honor, but if I... I really do have an answer to your question, and I'm afraid I don't know why I haven't been able to get it out. Let me try one more time, okay? There are lots of tools in FERC's tool chest. This is a big activity, and it's very carefully coordinated. There's the ISO New England tariff. There are rules about interconnection. They get revisited a lot. They were revisited in 2003, and they were revisited in 2013. They say nothing about the issue we're talking about here. The FERC is free to change that. There also is an interconnection agreement that's a form contract customized for this situation that's been in place for a long time. That's what FERC relies on. What we're saying is it doesn't carry the order of judgment that you want to put there. Other things could carry the order. The system can be... What else? Is there something else that FERC missed that would take away your veto power? Well, if they wanted to change the way interconnections worked, they could say, and, in fact, propose, or ask the ISO New England to show cause why we shouldn't change the tariff to say, in New England, we're not even going to study generators like Seawolf. Whatever happens to you happens. It's up to you to fix it. That would have changed this supposed veto. FERC says this contract, good utility practices plus 9.7.5, means no veto power. If the interconnecting entity is willing for the language to pay full construction costs. Would FERC say that? There's no planning meaning basis for it, Your Honor. I'm not saying... I'm saying could FERC, and whatever those proceedings you want them to do, 206 or whatever, could FERC say that? Yes. They could have a rulemaking. And it would apply to you and to Avangard, or are you saying it wouldn't be retroactive? There would be a file rate doctrine problem. But they could change the rule set any time they wanted. They proposed to do it. Would it apply to you going forward? They'd change the rules, sure. But you didn't challenge them here, did you? You didn't challenge that they lacked the remedial authority, or that they didn't exercise the correct remedial authority here. Well, Your Honor, I disagree with that. We challenged the authority they offered. The only thing they said they were relying on was this agreement. We then pointed out, being accused of trying to strangle competition, which is wrong, that there were many other tools FERC had available they chose not to use. The problem you're posing, Judge Millett, of what about all the different demands on the system, that's a really important question. It should be addressed generically, and FERC has plenty of room to address it. But they chose not to go down that road. There's a big problem, though, embedded here, Judge Millett, when you imagine the future. If FERC wants to change the rules to require incumbent resources to pay half the cab for new interconnections, that's a big change. That's not what the rules currently are, and it will introduce cost uncertainty. We talked about this blow, and FERC just never answered us. Projects are financed all around the country right now. Here are your interconnection costs. It's in a box. The banks come in. The lawyers look at it. Okay, we know what this is. You're financed. You're good to go. There's no situation where the grid can say, oh, guess what? Somebody new came in. You've got to pay their costs, half of their admission fee. That's not how it's worked for 20 years. The background rules are completely different, though. FERC could change it. The evidence of your half the admission fee, everything I read in your brief said there might be lost opportunity costs. There might be litigation. Of course, you're in that now. There might be other expenses. But everything was hypothetical. I disagree, Your Honor. Okay, where did you show concretely that you will, since you're already taking yourself online and yourself down, right? They're doing this at a time when you're already offline. Is this 23 days like the other one? How long are you going to be off this fall? We don't know exactly what the costs will be. Do you know how long you're going to be down this fall? The outage was scheduled for 10 days. We expect it to be another 10. 20 days? We expect 20 days full stop. We will be off an extra 10 days. When we calculated these numbers before, that looked like about $5 million. It might be 20 now, but it's a lot of money either way. There are other sorts of costs that might come through, some problems, there could be accidents in the installation. We asked to be made whole for all of that, and we filed a formula rate to do this. Because Abengrim was saying we were a transmission company. And so this would be regulated. FERC has formula rates all the time, so we laid out the components of our costs. We always said something was going to, there was money here that we think we should be able to collect. And we've been consistent about that the whole time. FERC acts like the outage might not need to be extended, and they claim after they've assumed contractual authority groundlessly to order us, and after they've assumed jurisdiction groundlessly to order us, and say we get to control your compensation, and we need to put the incentive on you to shorten your outage. So we're going to just say you have to eat whatever bad things happen as a result. Judge Billett, you wrote a decision a year ago called Citadel, and Judge Katsas, you were on the Belmont case about incentives, and those were about situations where FERC's handing out rate payer money, and the rate payers say wait a second, these people can't respond to the incentive, this is money for nothing. And you send these cases back saying that seems to make sense. FERC wants to put the onus on us to cut corners doing delicate surgery inside of a nuclear power plant. We can't respond to that incentive. We have to do what we have to do. FERC said it's just not going to up front license anything, costs that may come along later, because then you don't have the incentives. But as of now, we don't know. For all we know, for all we know, the circuit breaker could go in, be fine, it would be within your 20-day window, and there wouldn't be, that's possible. No, the window's 10 days. We're saying we need another 10. That's going to happen in September. I'm sorry, you need another 10 for what? To put the breaker in. We can't fit it in our existing outage window. And I don't think the federal government should be trying to tell us, make it happen to save your own money. Why is protecting Avidgrid's purse more important than protecting... Avidgrid said they can put it in in this fall window. There was a debate about that, but it's impossible. No, they didn't. Has Avidgrid said they can put it in? They did say that. The factual dispute about things that we don't know are going to happen in the future. Or not happen in the future. Your Honor, when we were in a regulated utility world proposing our formula rate, we took care of the uncertainty by definition. Because we said, we'll look backwards as formula rates do. If the outage really didn't need to be extended, then Avidgrid doesn't pay a dime. If it does, we'll calculate the different charges consistent with the formula rate. It's all under FERC's rate regulation at that point. And we'll work it out. And there could be a fight. We won't ask for anything imprudent. But FERC now says you're not providing any electric service to Avidgrid. So we say, this is a matter for commercial negotiation. We'll have a contract. You pay us what the price is. We can have a retroactive look back. We can have arbitration to fight about if there are disputes. And that would take care of it too. Either way, you could deal with the uncertainty. But why is it fair to have an existing generator pay substantial uncompensated costs? We're not talking just about fairness. I've asked several times, but what is your evidence that good utility practice in this circumstance where you have a generator and you have a new transmission line connecting. You said these contracts have been around for 20 years. What's your evidence that good utility practice doesn't require this type of upgrade? There are no generating companies coming in here in support of NextEra saying, you know, this is, like, you know, we're worried that this is going to happen in the future under our interconnection agreements that we're going to be required to do this. Your Honor. I mean, it seems to me that you need to have a contrary. You need to have some sort of evidence that FERC is wrong about what good utility practices require in general. Your Honor, everybody's been boiling with precautions for a while here. No one's come up with a single prior case where an existing generator anywhere around the country under the terms of the LGIA has been required to reach into its pocket and pay money to interconnect. You say there are no examples. There are no examples of this. This is the first time it's ever happened. And my real evidence, Your Honor, is on the page of the LGIA. It doesn't create that obligation for third parties. There might be other ways FERC could create this obligation, for sure. Now, I haven't gotten into jurisdiction. There's been no prior case where FERC has ordered a change in generation equipment. Just one last question from me. I assume you have a tariff governing your sales. With that tariff, if you get saddled with losing profits, would your tariff allow you to pass that loss on to your utility customers, or could you amend your tariff to allow that? No, we sell under market-based rates. We sell at the price the market will bear. This is a fight between two very large power companies. Nobody else pays for it. It's one or the other. Thank you very much. We'll give you a couple more minutes, Bill. Thank you. Good morning, Your Honors. Robert Kennedy on behalf of the Commission. Before getting into 9.75, I just want to touch on some of the questions that Your Honors raised with Seabrook's counsel. Judge Millett, you asked, essentially, the question is, if it's not emigrated, it's going to be someone else who's going to come up and push this breaker into over-duty status. If you look at JA 537, which is ISO New England's brief in response to the Commission's request, it indicates that there are a number of projects in the interconnection queue, and all of them are dependent upon the circuit breaker. All of them assume that the circuit breaker will be replaced to have sufficient headroom to allow these new projects to interconnect. Mr. Kennedy, even if that's true, what does that have to do with their contractual obligation to upgrade? It might be that there are other people looking to interconnect, but what does that mean? FERC's argument is that the contract requires an upgrade in these circumstances. I'm not sure what those other facts in the world even have to do with that contract. No, no. I'm just answering the question. No, absolutely. The Commission's determination here was based on the fact that under both Section 1.32 of the tariff, Section 4.3 of the interconnection agreement, there's a broad obligation for Seabrook to operate, maintain, and protect its facility in connection with good utility practice. The Commission then looked at Section Appendix C, Section B.3, and Provision 9.75 of the interconnection agreement to glean what that means. Essentially, does good utility practice require you to make a change to your facility in response to the changing topography of the grid? So Seabrook's Council says there are no examples of this, where they have these interconnection agreements, they've been around for a long time, and FERC has never interpreted these agreements in this way. What is your response to that? I agree, and the Commission notes this in the Orders. This is a unique circumstance because in the typical case, you have changes to transmission facilities. A generator wants to interconnect, a new project wants to interconnect, and it necessitates changes to the transmission facilities. There's a large body of case law on that that the Commission draws upon in its Orders here. It is rare that in this study process that generators be identified as parties that are affected by an incoming project, and there was some discussion in sort of the 206 pieces of this case as to the practices of other RTOs and the like. So I think for that reason, my understanding is that ISO New England is somewhat unique in that it identifies, it studies impacts on generators in its interconnection process. So I think that's why this is sort of a rare case. It's also a rare case because this, you know, most generators, this is an old facility, it's hooked up in 1990. Most generators are somewhat newer, and they, as a result, have more headroom in their circuit breakers. So most times an interconnection wouldn't impact. But the first rule here, you know, FERC's Order here would seem to have general applicability to any parties that have a similar type of interconnection agreement. A generator in these circumstances where there's a new transmission line would be required to upgrade. Correct. I mean, that is the Commission's position, that under section... Yeah, but not just for these parties. I mean, that, like, where the interconnection agreement has similar language. Correct. FERC's view of good utility practices requires this type of upgrade. Correct. Correct. Just as to why this hasn't come up before, I think it's a unique situation given the way interconnection studies are run and just the nature of this very facility, that it is impacted because it's already almost at capacity. It seems like there are various provisions in both the tariff and the interconnection agreement, which they don't squarely apply by their terms. But one way or another, they illustrate the principle that when a new entrant comes in and the connection will impose costs on others, the new entrant has to pay those costs. So what's the rationale? That's the basic principle. What's the rationale for excluding opportunity costs, which seem like they're real? Well, the Commission looked at... First, just kind of getting back... It could possibly be real, but getting back to what we ended on with Seabrook's Council, there is a dispute in the record as to... Your position is categorical. Correct. No opportunity costs can be subject to this obligation imposed on the new entrant to compensate. Correct. And that's kind of the baseline rule that the Commission established in the generator interconnection rule. The rule is that, A, it can be difficult for interconnecting parties to project what those engineering when they're working on their own facility. The Commission did have a carve-out that if parties come to an agreement on it, that's fine. But the pro forma rule is that lost profits and opportunity costs are not generally recoverable. And in this case, the Commission looked to maybe start the interconnection agreement because the obligation upgrade is grounded in that. Section 9.71 of the interconnection agreement says, with respect to compensation for outages, look to the tariff for any compensation that is due. So the Commission did that. It looked to Section 1.3.10, which we were speaking about earlier, and it looked at the language there. And it imposes upon the incoming party, the interconnection customer, the obligation to pay for the cost to construct the necessary upgrades. And the Commission viewed that as the cost to engineer, procure, and install. And I think that's sort of consistent with this course decision in the Southern Companies case that's cited in our brief where the Commission interpreted language saying the interconnection customer is responsible for all costs. The Commission interpreted that as direct costs given sort of the backdrop. And similarly, for attorneys' fees, background rule is the American rule. Yeah, it has been. Costs. Yes, yes. That's really limited to the direct, what the tariff costs to construct. And that's certainly, I mean, that's, if you look at sort of parallelism, you look at Seabrook's interconnection agreement, Section 18.2 of that, obviously which dealt with the upgrades necessary for their interconnection. It excludes lost profits and the like as well. You said, I'm just trying to pick out one word. You said generally they're excluded when you were answering, Judge. I'm sorry, generally? You said they're generally, things like opportunity cost are generally excluded. What I'm wondering is why you have that qualifier. If, for example, this were to take place and then through no fault whatsoever, in fact, through every best effort by Seabrook, something happened, whether or something, that caused it to take longer than expected. I get why FERC up front doesn't want to license all this because of its incentive concerns. But is there any mechanism after the fact, if there ended up being significant costs through no one's fault and everyone's best efforts, does Seabrook have any capacity to go back to the Commission and say, look, it's just unreasonable to have them pay? Would it be unreasonable not to let them have this or to have us split the cost of, you know, not right for New England, but a hurricane that came along? So, I want just to get to the first part of your question, why I said generally it's because in rule 2003A, the Commission left open the possibility for the parties to agree to loss of profits and the like. That's fine. As to your question, I mean, if you look at, and I think it's paragraph 104 of the initial order and the like, the Commission does note that at this point, it's speculative whether there will be any costs and the like. And it does hint at maybe that, you know, we don't know what's going to happen. But I will say at the end of the day... Is there anything that would bar them from coming back and... Well, I will say... I will say at the end of the day, what the Commission is doing here, it's interpreting Avangard's responsibilities under the tariff. I think it's interpreting tariff language that limits to the cost to construct regardless of the circumstance. So while there is a little bit of ambiguity and the Commission does note the speculative nature of the cost at this point, based on the facts that we know now, I think logically the Commission's ruling is grounded in the tariff language, which is not dependent on, you know, the future. And the Commission says... Avangard isn't a party to the tariff, though, is it? I mean, it's not a party to the contract. Not a party to the contract, but the Commission's interpreting their obligations under Section 1.3.10 of the tariff and the schedule for electric transmission upgrades, which says when you're coming on, this is your responsibility, the cost to construct. So that's what it's interpreting with respect to why... the extent of Avangard's cost responsibilities. How do you square... Oh, sorry, start that. Go ahead. I was going to... It seems odd that if really the rub here is they want protection against these unknown indirect costs that might actually never happen. But either FERC or we are supposed to decide that right now. It doesn't seem right, because they're just entirely speculating whether they're going to have excess costs. It's just not known on this record whether they will or not. But if they have no opportunity, if they have to get them up front, this FERC would not entertain, and after the fact, yikes, look what happened. We need to have compensation for this. On a record that, you know, full good faith, full every reasonable effort, and sometimes things just go wrong. Then they do have to litigate it now. But if they could go to FERC afterwards, then it would seem like the question about whether they can, under the contract, get these extra costs as part of the construction process that triggered the problem. Then it could be decided later with the real record  and whether it fits within FERC's conception of what the construction project entails. Obviously, I see your concern with ripeness and the like and the speculative nature of these, and again, the commission did point to it, which obviously you could see the appeal of coming back later with a complaint and saying circumstances have changed. But again, I'm not... You can't do that, then. Well, yeah, I'm not sure logically how that would, how the subsequent facts would change the commission's core decision here that AveraGrid's obligation is limited to the cost to construct the necessary facilities, which the commission has interpreted here as the direct costs. Is there a procedural bar to them coming back? I don't think there's a procedural bar and... They would have to say, and this should count as construction costs, X, Y, and Z. Perhaps a reasonable end would have to say. That's right, or this wasn't... I'm sorry. Can you please... You've got more instances than I have. No, no, no, no, no. I'm just saying the argument was made, look, this is confiscatory, potentially. I mean, we're out of service for a year or whatever it may be. And the commission said, well, no, that's speculative. Whether they could bring that back, I don't think there's a procedural bar. I'm just saying, given the logic of... Obviously, I'd like to say, yes, they can bring it back. Maybe this will all go away. But the logic, again, the logic of the commission's decision here is that we're talking about Avangrid's tariff. What the tariff obligates Avangrid to pay. And that seems disconnected from whatever the facts may show. Mr. Kennedy, if you could clarify for me, what remedial authority is FERC exercising? So I think... Because FERC brought us to responding to a sex proceeding, which is then abandoned. Correct. In the... So as you know... So what authority is the commission exercising? I think it's in its general authority. In the complaint order... Sorry, in the complaint, Avangrid did cite the commission's general authority under section... Under 309. Yeah, and I think that's what it's doing here, because it's just... And again, there hasn't been any challenge to this, but it's just interpreting... It's not finding that a provision is unjust and unreasonable. It needs to be changed. It's just interpreting the scope of the party to the present day. So I assume I disagree with FERC's interpretation of the contract. Then to reach this result, wouldn't FERC have to do a 206 proceeding? To... Yes, if there's no... If Your Honor believes there's no existing obligation and the commission wants to impose a sort of reciprocal obligation... They would have to find that the existing arrangement was unjust and unreasonable... Right. ...and then impose a new one. Correct. Correct. And as you were discussing with Steve Burke's counsel, obviously there's filed rate issues there, and we dealt with this in the PJM context, and I'm forgetting the name of the projects at issue there, but it becomes difficult when you're trying to figure out what rules should apply to a project that's working its way through the queue. But yes, if there was no obligation here and the commission wanted to impose one, it would have to do so through Section 206. And so in Burke's contract interpretation, it seems to me that the commission is placing a lot of weight on good utility practices, that good utility practices require an upgrade in these circumstances. And I'm wondering what good utility practice the commission can point to that suggests, you know, if an upgrade is required here, which I'm a bit doubtful, but if one is required, why doesn't it include the payment of indirect costs? Because it seems like there should be some parallelism there. Well, the commission talks about this in the re-hearing order. So I guess getting into the second part first about the cost. You know, the definition of good utility practice discusses things widely done in the industry. The commission's point with respect to that is outage costs, lost opportunity costs, are generally not permitted in the recoverable in the interconnection process for parties that have to go through it either. I mean, you see it in the tariff for generators that are affected by outages. You see it in the commission's case law regarding transmission owners that are affected by the interconnection and need to go down, that lost profits and the like, lost opportunity costs aren't generally coverable. So what the commission said in the re-hearing order, that demonstrates that the industry goes through with these projects without the assurance that, without the opportunity to recover these lost profits and the like. So what happens in Judge Millett's nightmare scenario? You know, they're offline for six months for nobody's fault. They're just crushed, getting crushed. They charge market rates so they can't pass on these costs because competitors aren't getting crushed in this way. Is that just a risk of doing business? Well, again, I think the commission does base some of its rulings on the speculative nature of these costs. I'm repeating myself. At the end of the day. When they come back with this ex-post as applied challenge, the answer is going to be the same. Well, I mean, I think that's the logic of the commission's orders here, which are based on the language of the tariff itself. It's not saying, it does raise some issues with the speculative nature of the damages, but I think at the end of the day, what the commission is saying here is Avingred's cost responsibility is limited to what it says in the tariff. And that is the cost of construction. Yes. Right. But there's a force majeure clause in the contract. And so if that were the cause, I assume FERC has not said, has not answered this question of extraordinary costs due to circumstances beyond everyone's control, how the force majeure clause would play into that application. Or I assume someone could argue that this actually, under the common law or whatever, counts as construction costs and FERC would have to address that once they had something concrete. The answer might be no for the reasons I said in the past, but if they haven't addressed this type of extraordinary problem before or the implications of force majeure clause, then it would be for FERC to answer later. And then courts could review the reasonableness of this decision. I think that's correct, Your Honor. There is no procedural bar. Just in my discussion today, I didn't want to suggest that it's just a completely open playing field. I completely appreciate your pandering. But yes, I'm not aware of any procedural bar if they were to come back with sort of what's called a nightmare scenario. If FERC had an issue with this order here and Seabrook didn't upgrade its generator, when Avangrid was ready to connect, would Seabrook be in violation of the tariff? I don't see how they would be in violation of the tariff in that situation. Of the tariff? Or the interconnection agreement. Well, under the commission's interpretation, they're obligated under section 9.75 to undertake this upgrade because the grid is going to change when they... But where in the words of 9.75 does that obligation exist? So I think it's in, obviously, the general thrust of... And I'll get to the specific language. But the general thrust of 9.75 is you need to have circuit breakers in place and you need to maintain and operate them in accordance with good utility practice. Now, the question is, does that mean I need a circuit breaker in place sufficient to protect my facility and my contribution to faults on the system based on the specifications when I hooked up or what the commission found? No, it's an ongoing obligation. And you may need, under these unique circumstances here, to upgrade in response to the grid as it exists now. You have an obligation to operate your facility and maintain it in accordance with good utility practice throughout. But this contract is a bilateral contract. It's not a contract with the world. It's anyone who may want to hook in. It is with ISO New England, the operator of the grid. And the facts here are that ISO New England undertook its study process and said once the Avon grid project hooks up, the breaker will be overdue. Once it hooks up, then they would be in breach if they didn't upgrade. Correct. And the commission's interpretation of Section 9.75 is you have an obligation to, obviously, you don't want to go through the scenario and say, okay, yes, you have to respond to the grid as it exists. We're going to let this project hook up and then you have to upgrade. I mean, you want it beforehand, logically, because the idea is to protect. You might want that, but then maybe that is just left to ordinary commercial negotiation. It's not an obligation. You know, because there's no breach, right? When does the breach occur? Like when is Seabrook in breach? If Avon grid says, okay, we're interested in connecting, you know, why is Seabrook in breach? Because they are refusing to operate their, you know, protect their system in accordance with good utility practice when they're. It's really all about the good utility practice. And it's kind of, it's essentially. I mean, at the end of the day, that is like FERC's primary argument. Well, yes, and the language is Section 9.75, which requires them to protect against any short circuit occurring on the system. And you can't point to any case, any situation or any case or order where FERC has required a generator to do this. No, I think it's rare that generators are identified as affected parties. Does FERC just sort of have a free floating ability to identify new good utility practices? Like it seems like good utility practice refers to something in the world, like industry standards that are established, that Seabrook would be on notice that they have to do because it's something that occurs. And if FERC wants to make a change, then they can go through 206. They can amend the tariff. But they didn't do that here. Well, because I think the commission did look at, did take that into consideration. Was there notice here that you may have to upgrade your facility in response to the changing conditions on the grid? And it looked at Section, Appendix C, Section B3, which talks about this very circuit that's now granted. That only deals with changes by New Hampshire transmission. It's only between the two. But the language in interpreting what the commission found highly relevant in interpreting what is required by good utility practice. And if you look at that section. Isn't that bootstrapping to say we're going to take a good utility practice and with reference to what two parties agree to in a bilateral contract? Or is that just sort of bootstrapping a bilateral contract into a general good utility practice? I don't think so, Your Honor. The way the commission looked at it is Section B3 is evidence of what good utility practice is. That there could be changes outside your fence line. And just a quote from Section B3, that could require you in accordance with good utility practice to make your own upgrades. And the commission is saying that that concept that you may have to respond to changes on the grid is inherent in good utility practice as evidenced by the agreement between these very parties. ISO New England, New Hampshire transmission, and Seabrook. So I don't think it's bootstrapping or imposing an unforeseen obligation. It's the notion that you may have to do something. Well, it's an unforeseen obligation as to off-grid, not as to New Hampshire transmission. Well, yes. I mean, again, this is – but the commission's point in here is – Well, and it does seem unforeseen if you can't point to any example where a generator has been required to do this. But I would push back that it's not unforeseen because the parties foresaw it here. With respect to each other. Right. And what the commission said in the initial order was, under what conception would good utility practice require you to upgrade your system in response to a change this party made, but not somewhere else in the grid, when the consequences, the undisputed consequences, if the Avangrid project hooks up, it exposes them to significant risk. That would be a nice policy argument, and FERC could have made that if it found that it was unjust and unreasonable to not let Avangrid connect. But it didn't do that. Again – It had an opportunity to. It actually spontaneously initiated 206 proceeding. 206 was brought up by the parties. Correct. But the commission found that there was sufficient language in the agreement that evidenced this obligation. Again, it looked at Section D3 to illuminate what good utility practice requires with respect to changes on the grid. I understood. Maybe I'm wrong, but good utility practice wasn't against the world standards, but good utility practice was in the context of a grid. Because it's a trilateral contract, right? Correct. And so, the good utility practice has to be within the framework of a grid and all the obligations that the grid itself, ISO New England has to bring new generation on. I think that's fair. And just fundamentally, at the end of the day here, you have a direction from the system operators saying, hey, when this hooks up, your facilities can be subject to extreme risk. And what the commission is saying is that good utility practice requires you to follow the system operator's directive in that regard. Everyone's reading here that, well, they can't, they can't. So, is the theory that, I just don't know how this works, could avid grid actually hook up and be connected and do everything but flip the switch for the power to come? And then, ISO New England says, they are not connected. And your circuit breaker is no good. They're flipping the switch Tuesday. You better get a new circuit breaker in now. I mean, there is, I think, the ultimate. It just says connected. Right. You can't connect. Right. They need to be connected. And when someone's connected, if it creates that problem, they have to replace it. Well, they can connect the wires, I assume, without actually turning the power on, at which point, clearly the obligation under 9.7.5 would kick in. Yeah. I think you're right. There is a construction phase, and then I think there's a phase, energization, where the switch is flipped. I mean, I don't know where they are since this has been postponed so many times, but they must be close to that point. I'm not certain this data can speak to that. I know the record reflects, obviously, that it's been pushed back a ways and that it is scheduled to go. The work needed here is scheduled to take place in the fall, but as to the overall state of the project, I'm not certain. Thank you very much. Thank you. Thank you, Your Honors. Mr. Canopka? Let me know if I said your name wrong. Good morning, Your Honors, and may it please the floor, Eric Canopka for the interveners. I want to start where I think we were going. There is a little bit of a misconception here that this project is being built for Avangrid. The reality is if you look at JA 536 to 537, ISO New England was responding to a question from FERC where basically it asked if there were alternatives to this, and it said, yes, there are actually alternatives to upgrading or replacing the breaker, building a series reactor or something like that. They didn't want to do that because that would cause side effects that they wanted to avoid. It would impede transfer from northern to southern ISO New England. And ultimately it said it would just kick the can down the road because the problem would just pop up somewhere else, right? All it would do is add back some headroom on the breaker that would get used up by other projects. So to pick up where my friend was saying, the reality is this is a directive from ISO New England, both to us and to NextEra to upgrade the breaker. And I think where he was essentially going is clearly good utility practice requires you to respond to directives from your RTO about what is required in light of changes to the grid. And the reality is the other thing that my friend, the other side is ignoring is that NextEra in fact did two paper upgrades of this breaker in the past. And presumably that was in response to changes on the grid, right? It was built originally with 150,000 amp limit, and then they upgraded it to 160 and I think 2010. And then again in 2016 to 165. And if it wasn't for changes on the system, I don't know why they did that. Assuming that's right, that good utility practices require this because the ISO says there's an interest in it. What does good utility practices say about costs? Good utility practices I'm sure are connected in part with costs, right? You have an obligation, but who has to pay? Right. So good utility practice does incorporate sort of a reasonable cost standard. And ultimately, right, one of the issues with their position, I think is that it doesn't require an interconnection for them to need to upgrade the breaker, right? There could be lots of other things that sort of take it over the hundred percent mark. And many of those, they would actually have to bear 100% of the cost, right? That's not the situation. Well, right. But the reality is at this particular point, they have an opportunity to upgrade the breaker when somebody else is actually footing the 18 and a half million dollar bill for all of the, all of the direct costs. Whereas tomorrow ISO New England could come out and say, actually, you need to have a 5% margin on your breaker. And by the way, under your own LGIA, you have an obligation to pay a hundred percent of that cost, right? All your direct costs, all your indirect costs and everything else here. They're actually in an advantageous position because we have to pay all of the, all of the direct costs of that, including about a million dollars to next era for their engineering and other personnel supporting the project. One factual question I wanted to mention is, I think I heard my friend on the other side say that the outage is 10 days and this is going to extend it by 10 days. J2 70. The average outage is actually three and a half weeks. Our experts came in and said, we thought we could do that within a week or two. The latest schedule outside the record is it's supposed to happen in about 10 days. And this idea that somehow going to, necessarily increase it by 10 days. It's just not supported. That is their estimate. That was their projection, but it's not necessarily going to happen. And that makes all of their costs speculative. Where is Avangard in the ready to connect process. So right now, the last I've seen is that we are scheduled to interconnect sometime in 2025 construction is underway. I think we've built about 25% of the holes, but as to this goes kind of above ground, there's, I think, maybe below ground, but we're sort of in the process of erecting the poles and creating the lines of doing the construction, you know, all of the wires and ultimately the converter facility as well. Can you connect without turning the power on? Yeah. The physical connections all in place. And then, then that's the new grid. Right. I mean, I think, so in response to some questions from FERC, again, ISO New England had sort of suggested that there may be alternative ways for us to interconnect without replacing breaker. And ISO New England basically said, yeah, there might be ways for us to sort of monitor the system, turn it on when we're not at risk of a high short circuit, turn it off when we are at a high risk of a short circuit, but we don't really want to do that. It creates a lot of complications and other things like that. I was asking a much more elementary question. And that is, can you get all the physical structures in place so that you are connected to this grid? I assume that's what happens. And then when all the screws are tightened, or whatever they are, wires connected, twisted together, there's a turn the power on. Is that right? As far as I know, that's correct, right? We're in the process of constructing all the necessary facilities that will ultimately include an interconnection to a substation in Maine. And then ultimately, you know, we would turn the power on and start supplying hydroelectric power to, to ISO New England. Obviously ISO New England won't let us do that until the breaker is in place because that's the, that's the opportunity. They won't let us turn the power off, right? Or they wouldn't let us turn it on and then require us to turn it off. And it's a high risk of a short circuit. Thank you. I think you asked for three minutes, so we will give you that, but we'll try to hold you to that. I did misspeak about the timing of the outage. It was expected to be 23 days and the installation of the breaker adds another 10. I apologize. Sorry, can you say that again? The outage is expected to be 23 days and the breaker replacement adds another 10, the way that the schedule works. So you are planning to already do 23 days. We already were planning to do that. I was wrong. When I said it was 10 plus 10, that's actually the money. We did upgrade the breaker to get a little extra headroom. We did it because we upgraded, we changed the capacity, we increased the capacity slightly of Seabrook station, all internal. We did have to do that. We wouldn't have had a breaker that would have performed its duties. That would have, would have been up to the task, but that does not mean we have to, we have to upgrade, replace it for having good. Counsel for intervener said that ISO New England could order Seabrook to have like a 5% margin and that you would bear the full cost of that. Is that, is that, can the ISO do that? No, no, they can't dictate, you know, changes in the, in the composition of the nuclear power plant. If, if, if an ISO is authority to run the grid and a duty to watch reliability and a good utility practice got FERC as far as it claims today, then your honor in your Belmont case, they should just have said every generator in new England has to change their plant to have dual fuel capability and fuel on site. They can't do that. If you look at ISO New England's brief. Because that's regulating generation. Yes. Is this a jurisdictional point or is this something about. Contracts. They, they both lack, there's no jurisdiction for FERC to approve that and there's no tariff or contract infrastructure to allow that. ISO New England filed a brief below and on J 5 34, they say article 9.7 0.5 does not require Seabrook upgrade the Seabrook breaker for the benefit of another entity's interconnection to the system as discussed above is the obligation of the interconnection customer. To work with the affected party to effectuate an upgrade required for interconnection. Sorry. Why couldn't they try to do that through a two Oh six proceeding to give them to give a 5%, you know, the 5% margin. Well, I think they would have no record evidence to support that being a reliability requirement, but they wouldn't have jurisdiction to order us under two Oh six to change a piece of generating equipment. Nor have they ever done that in the history of the federal power. The ISO determined that good utility practice required a 4% margin and good utility practices, reliable grid necessary for a reliable grid. You're saying they couldn't say to all generators on the grid, make sure your circuit breaker has a 4% reliability or margin on it because that's necessary for the reliability of our grid. Well, I can't do that. No, I don't think they can, but they will be saying it's necessary for future parties. ISO New England doesn't have the power to dictate the equipment inside of a generating station. They have the power to say you can hook up only three quarters of your capacity. They don't have the power to dictate your fuel supply or your protection. They could say to you, if you've got this on the cusp circuit breaker, you now need to go down to Jenner for, for the reliability of the grid because we like a 4% margin industry standard. So you're going to have to reduce, they could say, I think you just said require you to reduce your power outage so that you have that 4% margin. No, I was just making a general comment that ISO New England does have the ability to limit how much power a generator can put into the grid, but that has nothing to do with the breaker. I'm asking the question that they thought the way to maintain the reliability of the grid, because you, you or some other company refused to replace their circuit breaker. And the only way to keep the grid functioning reliably would be to say either replace the circuit breaker or reduce your output by do the math, whatever it is, 75 to down to 75%. Otherwise the grid's going to blow. They can do that, right? No, they could tell us we have to disconnect because there's a reliability problem. If they only can do disconnect, I thought you said that they can say reduce your output. I said they can tell you as a capacity resource, you can only inject X amount of, of a capacity overbuilt your plant for some reason. So, so they can dictate how much power you flow onto the system, but they can't dictate internal protective equipment within a nuclear power plant. That's the NRC's job. Okay. Any other questions? All right. Thank you very much. Okay.
judges: Millett, Katsas, Rao